1
2
3
4
5
6
7
8 **UNITED STATES DISTRICT COURT**

9 **CENTRAL DISTRICT OF CALIFORNIA**

10 **WESTERN DIVISION**

11

12 JUANA CEJA,      )    No. CV 17-1837-PLA
            )
13       Plaintiff,   )   **MEMORANDUM OPINION AND ORDER**
            )
14     v.       )
            )
15 NANCY BERRYHILL, DEPUTY  )
COMMISSIONER OF OPERATIONS )
16 FOR THE SOCIAL SECURITY  )
ADMINISTRATION,    )
17             )
      Defendant.  )
18 _____)

19 **I.**

20 **PROCEEDINGS**

21      Plaintiff filed this action on March 7, 2017, seeking review of the Commissioner's[1] denial

22 of her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income

23 ("SSI") payments. The parties filed Consents to proceed before a Magistrate Judge on April 27,

24

---

25     [1] On March 6, 2018, the Government Accountability Office stated that as of November 17,
26 2017, Nancy Berryhill's status as Acting Commissioner violated the Federal Vacancies Reform Act
(5 U.S.C. § 3346(a)(1)), which limits the time a position can be filled by an acting official. As of
27 that date, therefore, she was not authorized to continue serving using the title of Acting
Commissioner. As of November 17, 2017, Berryhill has been leading the agency from her position
28 of record, Deputy Commissioner of Operations.

2018.  Pursuant to the Court's Order, the parties filed a Joint Submission (alternatively "JS") on July 24, 2018, that addresses their positions concerning the disputed issue in the case.  The Court has taken the Joint Submission under submission without oral argument.

## II.

## BACKGROUND

Plaintiff was born on January 21, 1964.  [Administrative Record ("AR") at 36,180.]  She has past relevant work experience as a nurse assistant.  [AR at 36, 61.]

On July 23, 2012, plaintiff filed an application for a period of disability and DIB, and an application for SSI payments, alleging that she has been unable to work since April 27, 2011.  [AR at 28, 180-83, 186-89.]  After her applications were denied initially and upon reconsideration, plaintiff timely filed a request for a hearing before an Administrative Law Judge ("ALJ").  [AR at 141-42.]  A hearing was held on July 8, 2014, at which time plaintiff appeared represented by an attorney, and testified on her own behalf with the aid of a Spanish interpreter.  [AR at 48-65.]  A vocational expert ("VE") also testified.  [AR at 61-62.]  On August 7, 2014, the ALJ issued a decision concluding that plaintiff was not under a disability from April 27, 2011, the alleged onset date, through August 7, 2014, the date of the decision.  [AR at 28-38.]  Plaintiff requested review of the ALJ's decision by the Appeals Council.  [AR at 46.]  When the Appeals Council denied plaintiff's request for review on January 27, 2016 [AR at 10-14], the ALJ's decision became the final decision of the Commissioner.  See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted).  This action followed.

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (citation omitted). "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Id. (internal quotation marks and citation omitted). However, the Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." Id. (quoting Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (internal quotation marks omitted)). The Court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." Id. (internal quotation marks and citation omitted); see also SEC v. Chenery Corp., 318 U.S. 80, 87, 63 S. Ct. 454, 87 L. Ed. 626 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at least twelve months. Garcia v. Comm'r of Soc. Sec., 768 F.3d 925, 930 (9th Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

### A.    THE FIVE-STEP EVALUATION PROCESS

The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920; Lounsbury v. Barnhart, 468 F.3d 1111, 1114 (9th Cir. 2006) (citing Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999)). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim is denied. Lounsbury,

468 F.3d at 1114.  If the claimant is not currently engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting her ability to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. § 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient "residual functional capacity" to perform her past work; if so, the claimant is not disabled and the claim is denied.  Id.  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).  If the claimant meets this burden, a prima facie case of disability is established.  Id.  The Commissioner then bears the burden of establishing that the claimant is not disabled because there is other work existing in "significant numbers" in the national or regional economy the claimant can do, either (1) by the testimony of a VE, or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. part 404, subpart P, appendix 2.  Lounsbury, 468 F.3d at 1114.  The determination of this issue comprises the fifth and final step in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 721, 828 n.5 (9th Cir. 1995); Drouin, 966 F.2d at 1257.

**B.     THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 27, 2011, the alleged onset date.[2]  [AR at 30.]  At step two, the ALJ concluded that plaintiff has the severe impairments of diabetes mellitus, hypertension, right shoulder impingement,

---

[2]     The ALJ concluded that plaintiff met the insured status requirements of the Social Security Act through December 31, 2016.  [AR at 30.]

4

osteoarthritis, and degenerative disc disease in the lumbar spine. [AR at 30.] He also found that plaintiff's alleged depression was nonsevere. [AR at 30-31.] At step three, the ALJ determined that plaintiff does not have an impairment or a combination of impairments that meets or medically equals any of the impairments in the Listing. [AR at 31.] The ALJ further found that plaintiff retained the residual functional capacity ("RFC")[3] to perform light work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b),[4] except that she can only "occasionally stoop, knee[l], crouch, and crawl; and no overhead reaching and occasional shoulder level reaching with the right upper extremity." [AR at 31.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that plaintiff is unable to perform her past relevant work as a nurse assistant. [AR at 36.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that there are jobs existing in significant numbers in the national economy that plaintiff can perform, including work as a "production assembler" (Dictionary of Occupational Titles ("DOT") No. 706.687-010), as an "inspector" (DOT No. 727.687-062), and as a "folder" (DOT No. 920.687-098). [AR at 37, 62.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of April 27, 2011, through August 7, 2014, the date of the decision. [AR at 37-38.]

---

[3]    RFC is what a claimant can still do despite existing exertional and nonexertional limitations. See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." Massachi v. Astrue, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007) (citation omitted).

[4]    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Plaintiff contends that the ALJ erred when he considered plaintiff's subjective symptom testimony. [JS at 4.] As set forth below, the Court agrees with plaintiff and remands for further proceedings.

**A.   LEGAL STANDARD**

To determine the extent to which a claimant's symptom testimony must be credited, the Ninth Circuit has "established a two-step analysis." Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017) (citing Garrison, 759 F.3d at 1014-15).[5] "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Id. (quoting Garrison, 759 F.3d at 1014-15); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007)) (internal quotation marks omitted). If the claimant meets the first test, and the ALJ does not make a "finding of malingering based on affirmative evidence thereof" (Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and determine the extent to which [those] symptoms limit his . . . ability to perform work-related activities . . . ." SSR[6] 16-3p, 2016 WL 1119029, at *4. An ALJ must provide specific, clear and convincing reasons for rejecting a claimant's testimony about the severity of his

---

[5]   The Ninth Circuit in Trevizo noted that Social Security Ruling ("SSR") 16-3p, which went into effect on March 28, 2016, "makes clear what our precedent already required: that assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and 'not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness.'" Trevizo, 871 F.3d at 687 n.5 (citing SSR 16-3p). Thus, SSR 16-3p shall apply on remand.

[6]   "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

symptoms. Trevizo, 871 F.3d at 678 (citing Garrison, 759 F.3d at 1014-15); Treichler, 775 F.3d at 1102. During this inquiry, the ALJ may use "ordinary techniques of credibility evaluation, such as . . . prior inconsistent statements." Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (quoting Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996)). The ALJ may also consider any inconsistencies in the claimant's conduct and any inadequately explained or unexplained failure to pursue or follow treatment. Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).

Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ did not make a finding of malingering [see generally AR at 35-36], the ALJ's reasons for rejecting a claimant's credibility must be specific, clear and convincing. Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina, 674 F.3d at 1112; Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015)). "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834) (quotation marks omitted). The ALJ's findings "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" Brown-Hunter, 806 F.3d at 493 (quoting Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)). A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Bunnell, 947 F.2d at 346. As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

**B. ANALYSIS**

The ALJ found that plaintiff's "subjective complaints and alleged limitations" are (1) "out of proportion to the objective clinical findings and observed functional restrictions," (2) not consistent with the conservative treatment plaintiff receives, and (3) not consistent with her activities of daily living. [AR at 35.]

Plaintiff contends the ALJ provided "woefully insufficient reasons to reject" plaintiff's subjective symptom testimony. [JS at 6.] Defendant responds that the ALJ's reasons for

discounting plaintiff's subjective symptom testimony were "reasonable, and meet the substantial evidence standard of review."  [JS at 14.]

### 1.    Out of Proportion to the Objective Clinical Findings

The ALJ stated that plaintiff's "subjective complaints and alleged limitations are out of proportion to the objective clinical findings and observed functional restrictions."  [AR at 35.] Specifically, the ALJ stated the following:

> [Plaintiff] was diagnosed with right shoulder impingement and radiographs of the right shoulder in 2011 showed suspected rotator cuff tendon calcification.  An MRI arthrogram [with contrast] of the right shoulder in 2011 showed calcification of the shoulder and subchondral cyst in the humeral head.  She also exhibited positive Hawkin's [sic] and Neer's test and full range of motion with pain and discomfort.  But more recent radiographs of the right shoulder on August 30, 2013 were normal. [She] also complained of low back pain and radiographs showed degenerative disc disease.  Physical examinations noted decreased range of motion in the lumbar spine as well as decreased range of motion in the right upper extremity and decreased grip strength.
>
> . . . .
>
> There is no evidence of severe disuse muscle atrophy that would be compatible with her alleged inactivity and inability to function.  The treating records show that [plaintiff] has full range of motion although with pain and discomfort in her right shoulder.  In addition, more recent radiographs of the right shoulder on August 30, 2013 were normal.    Radiographs of [plaintiff's] lumbar spine only showed degenerative disc disease with no nerve root impingement or spinal stenosis. [Plaintiff] is able to ambulate without an assistive [device] or has an antalgic gait [sic].  She also exhibited normal range of motion in the lower extremities and there is no evidence of any neurological deficits.  Radiographs of the right knee showed only minimal degenerative joint disease in the medial compartment.  Radiographs of the left hip showed minimal degenerative changes in the left hip with joint space narrowing and some sclerosis of the roof of the acetabulum.

[AR at 34, 35 (citing AR at 431, 432, 433, 463-538).]

Plaintiff contends that the ALJ answered "the wrong question in articulating that the degree of limitation established by the objective medical evidence does not support" plaintiff's descriptions.  [JS at 9.]  She argues that instead of showing that he disbelieves plaintiff's testimony, an ALJ must find plaintiff not credible as a witness.  [Id. (citing Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) ("To find the claimant not credible the ALJ must rely either on reasons unrelated to the subjective testimony . . . , on conflicts between her testimony and her own conduct, or on internal contradictions in that testimony")).  Plaintiff contends that "the

ALJ failed to articulate any rationale sufficient to demonstrate [plaintiff] was anything other than credible." [Id.]

Defendant argues that while a lack of objective medical evidence cannot be the sole reason for rejecting plaintiff's excess symptom testimony, "it was the primary factor that the ALJ was required to consider." [JS at 16-17 (citing 20 C.F.R. § 404.1529(c)(2)); Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).] Defendant asserts that plaintiff's medical testing "returned only mild findings" and the ALJ "reasonably found that her allegations were not entirely consistent with the overall evidence in the record." [JS at 14 (citations omitted).] By way of example, defendant notes that the ALJ considered the diagnostic test results from 2011 and 2013, and plaintiff's 2011 right shoulder testing showed "suspected rotator cuff tendon calcification," but in 2013, "the shoulder exam was normal." [Id. (citing AR at 32-33, 431, 528, 530).] Similarly, defendant states that plaintiff's physical examination findings "were similarly mild." [Id.] She notes that in October 2012, Izizollah Karamlou, M.D., the consultative examiner, found decreased range of motion in plaintiff's lumbar spine and overhead reaching, but also recorded normal range of motion in her hands and wrists, normal gait, normal reflexes, and full muscle strength. [Id. (citing AR at 322-27).]

While a lack of objective medical evidence supporting a plaintiff's subjective complaints cannot provide the only basis to reject a claimant's subjective symptom testimony (Trevizo, 871 F.3d at 679 (quoting Robbins, 466 F.3d at 883)), it is one factor that an ALJ can consider in evaluating symptom testimony. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor the ALJ can consider in his credibility analysis."); accord Rollins, 261 F.3d at 857.

Here, however, the ALJ stated his conclusion that plaintiff's testimony was not "fully credible" because it was out of proportion to the objective findings and observed functional restrictions "as noted above." [AR at 35.] As the Ninth Circuit recently held, "an ALJ's 'vague allegation' that a claimant's testimony is 'not consistent with the objective medical evidence,' without any 'specific finding in support' of that conclusion, is insufficient." Treichler, 775 F.3d at 1103 (citation omitted). The "ALJ must identify the testimony that was not credible, and specify

'what evidence undermines the claimant's complaints.'" Id. (citation omitted); Brown-Hunter, 806 F.3d at 493. Although the ALJ summarized certain of the records when he made this statement [AR at 35], he did not specifically identify the testimony he found not credible and "link that testimony to the particular parts of the record" supporting his non-credibility determination. Brown-Hunter, 806 F.3d at 494.

Moreover, although the ALJ made much of the fact that plaintiff's 2011 right shoulder MRI arthrogram, x-ray arthrogram, and x-ray reflected one thing and the 2013 "radiographs," i.e., x-rays, showed another, this may be explained by the fact that MRIs and x-rays by definition reflect different things, and because in 2011, the MRI and the right shoulder arthrogram were both done with contrast. [AR at 528, 529.] In fact, the 2011 right shoulder arthrogram *confirmed* the rotator cuff tendon calcification that was only "suspected" based on the "conventional" x-ray taken the same day. [Compare AR at 528 ("THERE IS ROTATOR CUFF TENDON CALCIFICATION") with AR at 530 ("SUSPECTED ROTATOR CUFF TENDON CALCIFICATION").] And, the 2011 MRI with contrast confirmed the presence of a subchondral cyst in the humeral head of the right shoulder. [AR at 529.] There is no indication that any of the 2013 x-rays were done with contrast; thus, it is not surprising that they did not reflect the same findings as the 2011 x-ray arthrogram or MRI arthrogram. In short, "[t]his is not the sort of explanation or the kind of 'specific reasons' we must have in order to review the ALJ's decision meaningfully, so that we may ensure that the claimant's testimony was not arbitrarily discredited," nor can the error be found harmless. Id. at 493 (rejecting the Commissioner's argument that because the ALJ set out his RFC and summarized the evidence supporting his determination, the Court can infer that the ALJ rejected the plaintiff's testimony to the extent it conflicted with that medical evidence, because the ALJ "never identified *which* testimony [he] found not credible, and never explained *which* evidence contradicted that testimony") (citing Treichler, 775 F.3d at 1103, Burrell, 775 F.3d at 1138).

Even assuming, without deciding, that the ALJ's finding that plaintiff's subjective complaints were out of proportion to the objective medical evidence was specific, clear and convincing, and supported by substantial evidence, this reason by itself cannot be the sole legally sufficient reason for discounting plaintiff's subjective symptom testimony. Thus, the ALJ's determination to discount

plaintiff's subjective symptom testimony for this reason rises or falls with the ALJ's other grounds for discrediting plaintiff. As seen below, those other grounds are insufficient as well.

### 2. Conservative Treatment

In discounting a claimant's testimony, an ALJ may properly rely on the fact that only routine and conservative treatment has been prescribed. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). "Conservative treatment" has been characterized by the Ninth Circuit as, for example, "treat[ment] with an *over-the-counter pain medication*" (see, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (emphasis added); Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that the ALJ properly considered the plaintiff's use of "conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious medical treatment for [a claimant's] supposedly excruciating pain." Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999).

In this case, the ALJ stated that plaintiff is treated conservatively with pain medication and her "subjective complaints and alleged limitations are not consistent with the treatment she receives." [AR at 35.] He noted that although orthopedic surgeon, Qualified Medical Examiner ("QME") David H. Payne, M.D., had diagnosed plaintiff with "right shoulder impingement, rotator cuff tendinitis, calcification and calcific tendonitis [sic]," and had "recommended that [plaintiff] undergo right shoulder subacromial decompression," his "request for surgery was denied by the insurance company despite repeated requests."[7] [AR at 32; see also AR at 471-72, 475, 478, 480, 483, 486-87, 490, 494, 497, 509.] Additionally, the ALJ noted that Dr. Payne stated that plaintiff "has failed non-operative care including injections with no relief due to a partial rotator cuff tear." [Id. (citing AR at 475, 477).] The ALJ stated that he gave no weight to Dr. Payne's assessment

---

[7] There is no explanation in the record for the insurance company's repeated denial of the multiple requests for authorization for surgery.

that plaintiff was "temporarily totally disabled."[8]  [AR at 34.]  He also noted that Dr. Payne's assessments were for the purpose of workers' compensation, and that a determination of disability for Social Security purposes "must be made under the Social Security laws and regulations." [AR at 35.]  He did not otherwise discuss the weight given to Dr. Payne's other opinions, recommendation for surgery, and functional limitations.  [See AR at 32, 34-35.]

Plaintiff argues that the ALJ pointed to no medical evidence demonstrating that she "has in fact undergone a conservative course of treatment." [JS at 11.]  Indeed, she notes that doctors have recommended surgery requiring insurance authorization, which has been denied. [Id. (citing AR at 55, 291, 343, 465, 469, 472, 475, 481, 484, 487, 491, 495, 498, 510).]  She submits that the ALJ failed to point to anything in the record demonstrating "that there was anything more the doctors wanted [her] to do."  [Id.]  Defendant submits that the ALJ "observed that Plaintiff was 'treated conservatively with pain medication,'" and took no prescription medication for her pain, instead using only over-the-counter analgesics and anti-inflammatory agents.  [JS at 20 (citing AR at 35, 323, 347).]  Additionally, defendant observes that the ALJ noted that on February 13, 2013, another QME, orthopedic surgeon Todd W. Peters, M.D., opined that plaintiff's right shoulder did *not* require aggressive treatment.  [Id. (citing AR at 35, 541).]

Preliminarily, an ALJ "may not disregard a . . . medical opinion simply because it was initially elicited in a state workers' compensation proceeding . . . ." Booth v. Barnhart, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002).  Instead, an ALJ must evaluate the medical records prepared in the context of workers' compensation in the same way he would evaluate records obtained otherwise.  Id. (citing Coria v. Heckler, 750 F.2d 245, 248 (3d Cir. 1984)) ("[T]he ALJ should evaluate the objective medical findings set forth in the medical reports for submission with the workers' compensation claim by the same standards that s/he uses to evaluate medical findings in reports made in the first instance for the Social Security claim").  The ALJ is obliged to "translate" the workers' compensation findings into the applicable Social Security terminology "in

---

[8]    The term "temporarily totally disabled" is used in workers' compensation law to indicate a worker is unable to work at a certain moment or period in time.

order to accurately assess the implications of those opinions for the Social Security disability determination." Id. (citing Desrosiers v. Sec'y of Health and Human Srvcs., 846 F.2d 573, 576 (9th Cir. 1988)). Although the "translation" need not be explicit, the decision "should at least indicate that the ALJ recognized the differences between the relevant state workers' compensation terminology, on the one hand, and the relevant Social Security disability terminology, on the other hand, and took those differences into account in evaluating the medical evidence." Id. Further, an ALJ is not entitled to reject a medical opinion based "on the purpose for which medical reports are obtained." Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1200 n.5 (9th Cir. 2004) (citing Lester, 81 F.3d at 830).

Here, the ALJ did not provide any evidence that Dr. Payne was anything but an unbiased professional in conducting his examinations and writing his reports. Dr. Payne's reports, in fact, never equivocated about plaintiff's need for right shoulder surgery. Other than referring to Dr. Peters' February 2013 opinion purportedly finding that plaintiff "did not have a disability with regard to her right shoulder after reviewing [plaintiff's] treating records," the ALJ also failed to provide any evidence to support his implication that Dr. Payne's requests for authorization for surgery had been denied by the insurance company because surgery was unnecessary. [AR at 35 (citing AR at 540-42).] Moreover, despite the fact that Dr. Peters also was a QME for Workers' Compensation, the ALJ nevertheless overlooked this in Dr. Peters' case and gave Dr. Peters' opinion that plaintiff can perform light work "great weight" because he found it to be consistent with the evidence as a whole. [AR at 34.]

The ALJ, however, appears to have mischaracterized Dr. Peters' February 13, 2013, report. Dr. Peters first evaluated plaintiff on February 16, 2012. [AR at 550-70.] In his February 28, 2012, report of that evaluation, Dr. Peters noted that "this is an extraordinarily complex medical-legal evaluation," and separately considered issues of causation and apportionment for Workers' Compensation purposes for each of plaintiff's complaints. [AR at 550-51.] On examining plaintiff's shoulder, Dr. Peters found palpation pain over the "right AC joint," "pain with cross chest examination right compared to left," "mild palpation pain over the deltoid laterally, as well as the acromion," a positive impingement sign, and reduced range of motion in the right shoulder. [AR

at 555.]  At that time he diagnosed "[r]ight shoulder sprain/strain with impingement," and also noted that he had no MRI test results or treatment notes to review.  [AR at 557.]  Dr. Peters indicated that plaintiff had reported to him that an MRI scan had been done and surgery had been recommended.  [AR at 558.]  Dr. Peters concluded that he "think[s] that the one remaining issue of the shoulder and wrist [from a 2008 work injury] she is not permanent and stationary from."  [AR at 559.]  At that time, he also stated that he saw "causation industrial to the right shoulder injury."  [AR at 560.]  In preparing his February 28, 2012, report, Dr. Peters did not review Dr. Payne's August 11, 2011, examination or clinical findings, including the results of plaintiff's MRI arthrogram, positive Hawkins and Neer's test results, loss of range of motion with pain and discomfort, or Dr. Payne's decision to request right shoulder arthroscopic surgery for decompression of the shoulder.  [See AR at 563-70; see also AR at 509.]  With respect to plaintiff's right shoulder, Dr. Peters recommended "possible injections, MRI scan if this was not performed, and forward the need for possible surgery."  [AR at 560.]

Then, on June 28, 2012, Dr. Peters conducted a medical re-evaluation and issued a follow-up report in which he stated that plaintiff had "some swelling in the right shoulder and right axilla," as well as "decreased range of motion of the . . . shoulder, as on previous examination."  [AR at 543, 544.]  He indicated that he had now reviewed Dr. Payne's August 11, 2011, request for right shoulder surgery and positive examination findings regarding plaintiff's right shoulder pain, as well as a surveillance video that showed plaintiff's activities on March 23, 2012.  [AR at 549.]  With respect to the surveillance video, Dr. Peters noted that plaintiff carried her purse on her left shoulder, and that he did not see any "specific use of the right shoulder outside the range of motion on [his] examination in the office."  [Id.]  He also did not see "any specific heavy lifting or prolonged bending or stooping that would be outside of range of motion or explanation for lumbar spine issues."  [Id.]  This time, however, he concluded that he did "not see evidence in the previous medical record review of the description of the injuries for inclusion of the right shoulder *as a Workers' Compensation injury* based on [his] findings."  [AR at 546 (emphasis added).]  Dr. Peters opined that plaintiff "should have a 15 pound maximum lifting restriction with no pushing or pulling greater than 20 pounds and no prolonged bending, stooping, or squatting, and no

crawling."[9]  [AR at 546.]

On February 13, 2013, after being asked to clarify his somewhat conflicting report(s), Dr. Peters explained that in his "initial evaluation, review of records and questioning" of plaintiff, "an injury to the shoulder seemed appropriate."  [AR at 541.]  However, "in the further course of treatment, further records and evidence presented, seemed to have no disability, no resultant disability, no ratable disability and therefore, would be rated as a 0% disability for this injury."  [Id.]  Although still not the model of clarity, it appears, therefore, that although Dr. Peters at first thought plaintiff's shoulder injury was the result of a work-related incident, he later determined that it had not resulted from any such incident and/or (inexplicably) that she had no injury at all to her right shoulder.

On May 9, 2013, Dr. Payne expressed his frustration and disagreement with Dr. Peters' report(s):

> The patient comes in.  As you know, we requested surgery on the patient's shoulder, and the patient as always wanted surgery on her shoulder.  Dr. Peters in his QME report stated the patient does not want surgery on her shoulder, which directly contradicts and conflicts with the patient telling me when I had asked her.  Obviously I am not going to ask for surgery for the patient if she does not want it, which does not make any sense.  So, Dr. Peters actually put in the report [see AR at 546] that [plaintiff] is not interested in the invasive procedure.  Saying that the patient is not interested in the invasive procedure is simply not true.  The patient came in today.  She went to court on the second amendment [sic], but the doctor says he disagrees with me, and I am not sure which part he agrees with, but he disagrees with the fact that the patient wants surgery, but she says she does and I requested it.  Does he disagree with the fact that the patient's surgery is not indicated.  His own examination indicates that the patient requires surgery.  Does he disagree with that he must tell the truth; because clearly somebody is not been asked [sic] in this case.
>
> . . . .
>
> . . . This kind of case elucidates as to why the system should be that if the patient wants an operation and it is required, the patient should be given an opportunity to have it done.  Dr. Peters['] story just does not wash, does not pass the muster.  It is simply not believable.  It is conflicting and contradictory and should be ignored as

---

[9]   Although, like Dr. Payne, Dr. Peters was also a QME for Workers' Compensation purposes, the ALJ gave "great weight" to his diagnoses of "lumbar strain/sprain, right wrist sprain/strain, and right ankle sprain/strain," and to his opinion that plaintiff can perform light work "because it is consistent with Dr. Karamlou's assessment and the evidence as a whole."  [AR at 34.]  As noted, however, Dr. Peters did *not* include a diagnosis with respect to plaintiff's right shoulder injury, as he apparently now found that the shoulder injury was not the result of a work-related incident.

complete and utter nonsense. The doctor stated that the patient does not want surgery when she clearly does and then he goes and quotes the patient or he disagrees with my recommendations, which one is it. If he disagrees he should put that in the report. If the patient does not want surgery, then we would have never requested it. Dr. Peters' story has no credibility, none, and based on his lack of credibility, it should be completely ignored.

. . . .

. . . The following treatment plan is recommended and will be implemented upon attainment of authorization by the insurance company: Surgery when authorized. This report serves as an objection to Dr. Peters['] report, which is nonsensical.

[AR at 467-69.] The ALJ did not mention or comment on Dr. Payne's review of Dr. Peters' clearly inconsistent report(s), or even mention that Dr. Peters' reports were obviously inconsistent with each other.

Additionally, the ALJ's determination that plaintiff had been treated conservatively with pain medication, and defendant's assertion that plaintiff takes only non-prescription analgesics and anti-inflammatory medications, is not entirely accurate. In fact, the record reflects that plaintiff was taking the narcotic pain medication hydrocodone [see AR at 208, 330] and/or Vicodin [AR at 544], and that she has also undergone one or more injections in her shoulder. [AR at 477.] And, as noted by the ALJ, Dr. Payne repeatedly requested authorization for surgery; he also was not shy about expressing his frustration when that authorization was not granted. [See AR at 471 ("We recommended the surgery many times now. She has cyst, rotator cuff calcification and impingement. There is no mystery about this. I saw her back on February 7, 2013 I said the same thing in January, December, November, October, September and August. The patient needs an operation."); 475 ("Ms. Ceja needs surgery. We can only say it is true, she needs surgery on her shoulder. Rotator cuff is partially torn and cannot be fixed non-operatively. The patient is suffering with pain."); 478 ("I am going to request surgery on Ms. Ceja again because she would improve. I requested it numerous times. I am going [to] request once again here. She needs the operation, and she is doing poorly. There is no good reason not to do the operation."); 483 ("We requested surgery on Ms. Ceja's shoulder about 100 times now. She has right shoulder pain. She has impingement. She is still doing poorly."); 486 ("We have requested surgery about a thousand times now.").]

Based on the foregoing, the Court cannot confidently conclude that the ALJ rejected plaintiff's testimony on permissible grounds and did not arbitrarily discredit her testimony regarding pain.  Brown-Hunter, 806 F.3d at 493 (quoting Bunnell, 947 F.2d at 345-46).  Thus, this was not a specific, clear and convincing reason for discounting plaintiff's subjective symptom testimony.

### 3.    Activities of Daily Living

The ALJ noted the following about plaintiff's subjective symptom testimony:

> [Plaintiff's] activities of daily living further support the findings above.  [She] lives alone in an apartment.  [She] reported to Dr. Bagner that she is able to bathe and dress without assistance, she takes a walk, makes her bed, she reads and watches television, she is able to pay her own bills and handle money, and has a good relationship with her family.  [She] testified that she is able to drive, although it is less because of her shoulder injury and back problems.  She stated that she is able to dress and bathe herself, cook, and perform household chores.  A surveillance video of [plaintiff] performing daily activities also show[s] her ability to drive, get in and out of the car, park, go to the market, store, and restaurant.  It also showed that [she] was able to walk without a limp.  In addition, although [she] testified she could only stand 10 to 15 minutes and sit 20 to 30 minutes, she stated in her pain questionnaire that she can stand and sit 2 hours at a time.

[AR at 35-36.]

An ALJ may discredit testimony when plaintiff reports participation in everyday activities indicating capacities that are transferable to a work setting.  Molina, 674 F.3d at 1113. "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting [plaintiff]'s testimony to the extent that they contradict claims of a totally debilitating impairment." Id. (citing Turner v. Comm'r of Soc. Sec., 613 F.3d 1217, 1225 (9th Cir. 2010); Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009)).  "Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination." Trevizo, 871 F.3d at 682 (citing Ghanim, 763 F.3d at 1165).  However, "ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." Garrison, 759 F.3d at 1016.  "[T]he mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way

detract from her credibility as to overall disability." Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001).

Plaintiff contends that the ALJ "did what the Ninth Circuit cautioned against: referring to [plaintiff's] daily activities and apparently concluding that they were partially inconsistent with [her] claimed disability." [JS at 11 (citing AR at 35-36).] She contends that the ALJ did not describe how plaintiff's "ability to do sporadic and limited household chores and taking care of her personal needs . . . are inconsistent with specific symptom claims made by [plaintiff]." [Id.] She further contends that the ALJ failed to explain how plaintiff's activities would permit her to obtain and maintain a job. [Id. (citing Burrell, 775 F.3d at 1138; Brown-Hunter, 806 F.3d at 493-94).] Defendant asserts that the ALJ properly considered plaintiff's daily activities, including a surveillance "video showing her going about a normal daily routine," including "driving, parking, going to the market, store, and a restaurant." [JS at 18 (citing AR at 35-36, 291).]

Here, the ALJ summarized in part the March 23, 2012, surveillance video that showed plaintiff driving, getting in and out of her car, parking, going to the market, store, and a restaurant, and reflected that she walked without a limp. [AR at 36 (citing AR at 548).] He did not elaborate any further as to why or how these activities in any way detracted from plaintiff's testimony. Indeed, Dr. Peters, who reviewed the surveillance video, noted that it showed plaintiff "carrying a purse on her left shoulder," and stated that he did "not see specific use of the right shoulder outside the range of motion" displayed at his office examination, or "any specific heavy lifting or prolonged bending or stooping that would be outside of range of motion or explanation for lumbar spine issues."[10] [AR at 549.] Thus, with respect to plaintiff's shoulder and back pain, the video, at least in part, was not inconsistent with plaintiff's testimony.

Similarly, although the ALJ mentioned that plaintiff told Dr. Bagner or others that she can bathe and dress without assistance, take a walk, make her bed, read and watch television, pay

---

[10]    Dr. Peters further stated that plaintiff walked without a limp and did not use an assistive device, "which indicates minimal pain in the ankle," and that she performed many grasping activities, "which showed good range of motion in her right wrist without any signs of pain." [AR at 549.]

her own bills and handle money, drive (although less now because of her shoulder injury and back problems), cook, and perform household chores, not only did the ALJ fail to "link that testimony to the particular parts of the record" supporting his non-credibility determination, he also failed to take into account that plaintiff repeatedly testified -- both in her pain questionnaire and at the hearing -- that she either does these things with assistance or with one hand, or that she only does light cooking or cleaning. [See AR at 57, 222-33.] Indeed, the mere fact that plaintiff carries on certain daily activities "does not in any way detract from her credibility as to her overall disability." Revels, 874 F.3d at 667-68 (citation omitted). An ALJ must take into account a claimant's description of her daily activities and any limitations on her ability to complete those activities. Id. at 668 (noting that the bar for rejecting a claimant's symptom testimony is a high one).

Additionally, the ALJ stated that plaintiff testified at the hearing on July 8, 2014, that she could stand 10 to 15 minutes and sit 20-30 minutes, but that in her September 6, 2012, pain questionnaire almost two years *earlier*, she had indicated she can stand and sit for 2 hours at a time. [AR at 36 (citing AR at 222-24); see also AR at 57-58 (testimony).] Again, the Court is left to assume that the ALJ found such testimony to be inconsistent and to reflect a lack of trustworthiness. However, the ALJ did not ask plaintiff to explain why her statements in 2012 regarding her ability to sit or stand for any period of time differed from her statements in 2014. And, her statements in 2012 -- as true of her statements in 2014 -- would still likely preclude her from light work, which requires a "good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."

Thus, this was not a specific, clear and convincing reason for discounting plaintiff's subjective symptom testimony.

## C.    CONCLUSION

The Court finds the ALJ's subjective symptom testimony determination to be virtually indistinguishable from the subjective symptom testimony determination rejected by the Ninth Circuit in Brown-Hunter. As in Brown-Hunter, the ALJ here "simply stated [his] non-credibility conclusion and then summarized the medical evidence supporting [his] RFC determination."

Brown-Hunter, 806 F.3d at 494.  Although the ALJ also summarized plaintiff's daily activities, he did not identify the testimony he found not credible, and "link that testimony to the particular parts of the record" supporting his non-credibility determination.  Id.  In short, "[t]his is not the sort of explanation or the kind of 'specific reasons' we must have in order to review the ALJ's decision meaningfully, so that we may ensure that the claimant's testimony was not arbitrarily discredited," nor can the error be found harmless.  Id.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  Trevizo, 871 F.3d at 682 (citation omitted).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  Id. (citing Garrison, 759 F.3d at 1019).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Garrison, 759 F.3d at 1021.

In this case, there are outstanding issues that must be resolved before a final determination can be made.  In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.  Because the ALJ failed to provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting plaintiff's subjective symptom testimony, the ALJ on remand, in accordance with SSR 16-3p, shall reassess plaintiff's subjective allegations and either credit her testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any testimony.  The ALJ shall then reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the

national economy that plaintiff can still perform.[11]

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that: (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  August 2, 2018

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

---

[11]  Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to her past relevant work.

21